IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SUGARTOWN WORLDWIDE LLC | : | CIVIL ACTION |
| v. | : | NO. 14-5063 |
| KENNETH LINN SHANKS, et al. | : | |

KEARNEY, J.                                                                                          DECEMBER 10, 2015

## MEMORANDUM

Corporate entities often sell assets to third parties as part on an ongoing business strategy particularly when facing insolvency or necessary restructuring. This strategy is constrained when commonly owned privately held entities simply restructure by selling the benefits of their ongoing business to another wholly owned entity and leave the seller with millions of dollars of contract liability to third parties and the newly formed entity continues the same business with identical shareholders, employees, locations, leases, customers and company name. Judges have long held these transactions, akin to piercing the corporate veil but in the transactional context, may create successor liability upon the successor buyer entity when it is essentially the same enterprise under a different name. The law, as a matter of equity, excepts these disguised machinations from the general rule of no successor liability in asset sales and requires we find, given no genuine issues of material fact, successor liability upon the commonly owned purchasing entity. In our December 8, 2014 Order, we granted Plaintiff Sugartown Worldwide LLC's motion for summary judgment on its successor liability claim against Outlook International (SG) PTE, Ltd. for the $5,970,390.75 judgment now pending against Outlook International Limited in this Court.

I.   UNDISPUTED FACTS RELATING TO SUCCESSOR LIABILITY

While there are numerous issues of material fact concerning July and September 2012 transactions between Outlook International Limited ("Outlook Hong Kong") and Outlook International (SG) PTE, Ltd. ("Outlook Singapore"), there are also several undisputed facts warranting judgment as a matter of law on Sugartown Worldwide LLC's ("Sugartown") claim for successor liability against Outlook Singapore.[1]

In January 2010, Outlook Hong Kong unconditionally guaranteed all sums due Sugartown under a license agreement with HFI Brands, Inc. ("HFI") relating to the use of Sugartown's Lilly Pulitzer trademarks and intellectual property rights in furniture manufactured and inspected by Outlook Hong Kong in Asia. Defendants Shanks and Glover controlled both HFI and Outlook Hong Kong.[2] At the time, Outlook Hong Kong annually invoiced over $12.5 million.[3] Their companies paid Shanks and Glover dividends ranging from $200,000 to $1,300,000 a year from 2003 to 2011.[4] Their salaries ranged from over $18,000 to over $23,000 a month from 2006 into 2013.[5]

During 2012, Outlook Hong Kong suffered the loss of two customers.[6] On January 18 and February 18, 2012, Sugartown noticed HFI's default on license payments.[7] On February 28, 2012, Outlook Hong Kong's officers knew of "problems everywhere and getting to market is not going to be easy... [and] it doesn't sound promising."[8] HFI's officers told Outlook Hong Kong, "HFI Brands' current valuation is based more on its liquidation value then [sic] any real market value."[9] HFI continued, "we believe the logical next step should be to begin preparation for a 'Self Liquidation'... The proceeds would be handled... with the secured creditors getting paid first, then all remaining creditors receiving payment with the residual liquidation proceeds."[10] Under this proposal, HFI would have $1,862,183 in remaining assets available to pay

2

$13,470,856 in debt to unsecured creditors.[11] On February 29, 2012, Glover attached Sugartown's demand for payment and told Shanks, "I see we are still really on the hook for this, another terrible mistake in judgment."[12] Outlook Hong Kong's officers knew if HFI failed, Outlook Hong Kong's guaranty to Sugartown required payment of over five million dollars ($5,000,000).[13]

On March 28, 2012, Shanks and Glover incorporated Outlook Singapore.[14] Beginning in March 2012, upon forming Outlook Singapore, Shanks and Glover began transacting business through Outlook Singapore and customers paid Outlook Singapore.

Shanks admits Outlook Hong Kong lost a lot of money and ran out of money by July 2012.[15] Shanks also admits Outlook Hong Kong's expenses exceeded its revenues by July 1, 2012.[16] Outlook Hong Kong lost $4 million dollars by year end 2012.[17]

On July 1, 2012, Outlook Hong Kong sold all of the stock of its branch offices to Outlook Singapore for approximately $640,000.[18] Sixty days later on September 1, 2012, Outlook Hong Kong sold the assets of its representative offices to Outlook Singapore for approximately $320,000.[19] In total, Outlook Singapore paid $962, 783.55 for the stock and assets of Outlook Hong Kong's branch and representative offices.[20] Shanks and Glover signed the operative documents for the transfers of stock and assets.[21] Outlook Singapore paid Outlook Hong Kong intermittently on its obligations and not on the date of the transactions.[22]

Outlook Hong Kong did not sell Outlook China's approximate $500,000 in accumulated employee severance obligations.[23] At the time of these transactions, Outlook Hong Kong served as the guarantor of over $5 million dollars to Sugartown. Glover, as Outlook Singapore's representative, did not notify Sugartown or request Shanks to notify Sugartown of these transactions, even though Glover knew at this time of Outlook Hong Kong's debt to

3

Sugartown.[24] Outlook Singapore made no effort to set aside funds for Outlook Hong Kong's creditors including Sugartown.[25]

Outlook Singapore had no branch or representative office before July 1, 2012 and all work was done at facilities it did not own. In 2012, Outlook Singapore generated over 98% of its revenue from former Outlook Hong Kong customers.[26] In 2013, Outlook Singapore generated 76.5% of its revenue from former Outlook Hong Kong Customers.[27] Outlook Singapore paid on the depreciated book value of the hard assets of each office.[28] Following the transaction, employees working for Outlook Hong Kong assumed positions at Outlook Singapore including the Outlook Hong Kong employee responsible for accounting and financial matters.[29] Outlook Hong Kong employees' seniorities were also assumed by Outlook Singapore.[30] Outlook Singapore paid nothing for the employees. Further, Outlook Singapore paid nothing for Outlook Hong Kong's customers.[31] Outlook Singapore took over some of the same locations of Outlook Hong Kong.[32]

Outlook Singapore continues using the Outlook name.[33] Outlook Singapore paid nothing for the name. Shanks and Glover owned and controlled both Outlook Hong Kong and Outlook Singapore and were its officers and directors.[34] Cecilia Tan worked initially as the primary administrative person for Outlook Hong Kong and then, upon forming Outlook Singapore, worked for it. Many of Outlook Hong Kong's management and other employees became Outlook Singapore employees and Outlook Singapore recognized their seniority and benefits accrued at Outlook Hong Kong.[35] Glover testified his role as running field operations did not change in any way as a result of the asset transfer to Outlook Singapore. Supervisory personnel at Outlook Hong Kong became supervisory personnel with Outlook Singapore.[36] Outlook Singapore operated out of the exact same location and opened up no additional locations.

Outlook Singapore assumed Outlook Hong Kong's leases.[37] Outlook Singapore operated in the same manner as Outlook Hong Kong and used the same business model.[38] Outlook Singapore has no physical presence of any kind and no employees in Singapore and often used the Outlook Hong Kong mailing address. When Outlook Singapore opened its bank account it used Outlook Hong Kong's address.[39] Shanks and Glover testified Outlook Singapore picked up work where Outlook Hong Kong left off.[40] Outlook Singapore serviced Outlook Hong Kong's customers.[41] Shanks, acting in both roles, cancelled an Outlook Hong Kong service agreement with a customer and then simultaneously had Outlook Singapore enter into a service agreement with the same customer even before Outlook Singapore purchased Outlook Hong Kong's assets.[42] Outlook Singapore paid for computers and servers and used the same ones as Outlook Hong Kong.[43]

Shanks, as the financial person, testified he did not know of any changes as a result of the change in ownership of assets and stock from Outlook Hong Kong to Outlook Singapore.[44] Glover also found no difference in the function of the companies other than the business strategies.[45] Outlook Singapore's employee, Cecilia Tan, characterized the transfer of ownership from Outlook Hong Kong to Outlook Singapore as the nature of the business remaining unchanged.[46]

On October 26, 2012, Sugartown sent a notice of default to Outlook Hong Kong on its guaranty.[47] Outlook Hong Kong did not respond to the notice of default.[48] Sugartown then sued Outlook Hong Kong on November 30, 2012.[49] Outlook Hong Kong did not defend the lawsuit and on March 19, 2013, this Court entered default judgment against Outlook Hong Kong in the principal sum of $5,857,100 plus interest at a rate of 2% per annum calculated through February

8, 2013 in the amount of $113,290.75 with interest continuing to accrue at the rate of 2% per annum from February 8, 2013. ("March 19, 2013 Judgment").[50]

## II. ANALYSIS

We address only Sugartown's motion for summary judgment for successor liability on its March 19, 2013 Judgment against Outlook Singapore.[51] The parties agree Outlook Singapore obtained almost all of Outlook Hong Kong through two transactions: a stock sale as to Outlook Hong Kong's branch offices on July 1, 2012 for over $642,000 representing approximately two-thirds of the purchase price; and, an asset sale of Hong Kong's assets at its representative offices for approximately $321,000 representing approximately one-third of the purchase price.

The parties do not dispute Outlook Singapore's stock purchase of the branch offices creates immediate successor liability as a stock purchaser now owns the assets and liabilities of those branch offices.[52] Neither party chose to argue the effect of the purchase structure upon Outlook Singapore's successor liability. Given our findings on successor liability through the asset sale paradigm, we decline to opine on the successor liability effect of a transaction where the majority of consideration is paid in a stock sale. Notwithstanding the contracts, our determination is a matter of equity designed to look beyond a contract.[53]

Sugartown seeks to impose Outlook Hong Kong's judgment liability upon Outlook Singapore by invoking an exception to the general rule holding a purchaser of assets does not automatically embrace the liabilities of the seller simply by purchasing all the assets of another company.[54] Sugartown alleges successor liability arguing the transactions between Outlook Hong Kong and Outlook Singapore amount to a consolidation or *de facto* merger or Outlook Singapore is a mere continuation of Outlook Hong Kong.[55] Sugartown cites two exceptions to the general principle of successor liability arising from the acquisition of all the assets.

These two exceptions known as the *"de facto"* merger or mere continuation theories are generally treated identically as both arise where there is a continuity of identity between the buyer and the seller.[56] "Each exception depends upon the identity of ownership between the seller and purchaser."[57] The mere continuation analysis "focuses on whether the new corporation is merely restructured from the old, while *de facto* merger analysis inquires whether a transaction - though structured as an asset purchase – factually amounts to a consolidation or merger."[58] Following our Court of Appeals, we treat these two exceptions identically.[59]

We examine the substance rather than the form elected by the parties. We review several factors in determining successor liability under either a *de facto* or continuation exception: (1) continuation of the enterprise of the seller corporation so there is continuity in management, personnel, physical location, assets and general business operations; (2) continuity of shareholders resulting from the purchasing corporation paying for the acquired assets with shares of its own stock, this stock ultimately coming to be held by the shareholders of the seller corporation so that they become a constituent part of the purchasing corporation; (3) the seller corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible; and, (4) the purchaser assumes the obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the seller.[60] We consider the continuity of ownership to be critical to a successful successor liability claim but must conduct a full analysis of each of the factors. "The elements of the *de facto* merger are not a mechanically-applied checklist, but a map to guide a reviewing court to a determination that, under the facts established, for all intents and purposes, a merger has or has not occurred between two or more corporations, although not accomplished under the statutory procedure."[61] "Continuity of ownership or stockholder interest in some form must be shown, but the manner in

7

which it may be shown is more extensive and attuned to the transactional realities" than requiring strict compliance with every factor relating to *de facto* merger.[62]

### 1. Continuity of Ownership

The parties do not dispute Outlook Singapore is owned by the same people who owned Outlook Hong Kong. Shanks and Glover formed Outlook Singapore shortly before they began transferring assets from Outlook Hong Kong to Outlook Singapore. We examine continuity of ownership to "identify situations in which shareholders of a seller corporation unfairly attempt to impose their cost or misdeeds on third parties by retaining assets that have been artificially cleansed of liability."[63] Having found continuity of ownership, we evaluate the remaining factors with a strong presumption of imposing successor liability.

### 2. Continuity of the Enterprise

With the limited exception of the obligations owed by Outlook China retained in Outlook Hong Kong, all other undisputed evidence supports the finding of continuity of enterprise with Outlook Singapore. Outlook Singapore, through several agreements, purchased assets. It continued working in the same locations. It continued to have the same employees. It continued working with the same management. As confirmed in oral argument, operations once managed by Outlook Hong Kong became, on the next day, operations managed by Outlook Singapore. Outlook Singapore purposely used the name Outlook to continue its operations. As several witnesses confirmed, Outlook Singapore operations mirrored those of Outlook Hong Kong as to a vast majority of its business.[64] While it may appear Outlook Hong Kong remained an operating entity, and may have had limited revenues after September 2012, over ninety-eight percent (98 %) of Outlook Singapore's revenues derived from Outlook Hong Kong. As Judge Brody recently found, an argument focusing on a discrete portion of assets rings hollow when Outlook

Singapore becomes the same business and received Outlook Hong Kong's assets used in its business and "the ability to generate more business in the future using [Outlook Hong Kong's] name, personnel, former managers, assets and business relationships."[65] Outlook Hong's operations became the management responsibility and ownership of Outlook Singapore which received the benefit of those customers, employees, and physical plants once maintained by Outlook Hong Kong. This factor also weighs in favor of successor liability.

### 3. Outlook Hong Kong's Continuing Operations.

Outlook Singapore became, for all intents and purposes, the operating arm of Shanks' and Glover's continuing efforts to maximize their business interests. Their strategy included leaving some liabilities in Outlook Hong Kong. It is not clear at this stage whether Outlook Hong Kong has any continuing operations as the parties seem to disagree. The parties do agree that Outlook Hong Kong is no longer in existence. Even assuming Outlook Hong Kong maintains some existence for purposes of sheltering liabilities, it ceased to exist in servicing customers, maintaining employees, and operating a business after its July 1 and September 1, 2012 transactions with Outlook Singapore. It ceased its ordinary business operations and by the end of 2012, losing millions of dollars, it devolved into an assetless shell.[66] This factor again supports a finding of continuing or *de facto* merger.

### 4. Assuming other liabilities to continue business operations.

Outlook Singapore assumed Outlook Hong Kong's leases, employee severance obligations, customer relationships, and job responsibilities. It assumed obligations moving forward, with the exception of Outlook Hong Kong's guaranty liability and imminent judgment. Outlook Singapore assumed the obligations necessary for the uninterrupted continuation of normal business operations managed by the same shareholders, officers and directors, for the

9

same customers, from the same locations and based upon the efforts of the same employees for the most part.

## III. CONCLUSION

Outlook Singapore attempted to have the best of both worlds beginning as a new entity formed by the failing Outlook Hong Kong shareholders, customers, employees, and business relationships but without the known multi-million dollar guaranty liability owed to Sugartown. As a matter of equity, we do not allow entities to succeed in this transparent attempt to avoid obligations. While questions of fact preclude summary judgment as to Shanks,' Glover's, and Outlook Singapore's tort liabilities, there are no genuine issues of material fact regarding the corporate machinations effected through the July and September 2012 transactions rendering Outlook Singapore as a continuation of Outlook Hong Kong. Sugartown established *de facto* or continuation theories of successor liability. As there are no genuine issues of material fact concerning these issues, we entered summary judgment in favor of Sugartown and against Outlook Singapore on the successor liability claim for the March 19, 2013 Judgment.[67]

---

[1] The Court's Policies require moving parties file a Statement of Undisputed Material Facts ("SUMF") in support of a Fed.R.Civ.P. 56 motion, as well as an appendix of exhibits or affidavits. Sugartown moved for summary judgment and filed its SUMF and Appendix at ECF Doc. No. 93 ("Sugartown SUMF"). Defendants Kenneth Lynn Shanks ("Shanks") and James Michael Glover ("Glover") responded to Sugartown's SUMF at ECF Doc. Nos. 107 and 111, respectively. Outlook Hong Kong and Outlook Singapore did not file Oppositions to Sugartown's motion for summary judgment.

Shanks, Glover, and Outlook Hong Kong each moved for summary judgment, and filed a SUMF at ECF Doc. No. 98 ("Shanks SUMF"), ECF Doc. No. 90 ("Glover SUMF"), and ECF Doc. No. 99 ("Outlook Hong Kong SUMF"). Sugartown responded to Shanks' SUMF at ECF Doc. No. 109, Glover's SUMF at ECF Doc. No. 105, and Outlook Hong Kong's motion at ECF Doc. No. 110.

[2] Sugartown SUMF ¶ 24.

[3] *Id.* ¶ 12.

---

[4] *Id.* ¶ 15.

[5] *Id.* ¶ 14.

[6] *Id.* ¶ 18.

[7] *Id.* ¶ 45.

[8] *Id.* ¶ 48.

[9] *Id.* ¶ 54

[10] *Id.*

[11] *Id.* ¶ 56.

[12] *Id.* ¶ 50.

[13] *Id.* ¶ 58.

[14] *Id.* ¶ 59.

[15] *Id.* ¶ 60.

[16] *Id.* ¶ 61.

[17] *Id.*

[18] *Id.* ¶ 64.

[19] *Id.*

[20] *Id.*

[21] *Id.* ¶ 66.

[22] *Id.* ¶ 83.

[23] *Id.* ¶ 67.

[24] *Id.* ¶ 71.

[25] *Id.* ¶ 72.

[26] *Id.* ¶ 82.

[27] *Id.* ¶ 82.

[28] *Id.* ¶ 99.

[29] *Id.* ¶ 105.

[30] *Id.*

[31] *Id.*

[32] *Id* ¶ 107.

[33] *Id.* ¶ 119.

[34] *Id.* ¶ 112.

[35] *Id.* ¶ 114.

[36] *Id.* ¶ 116.

[37] *Id.* ¶ 117.

[38] *Id.* ¶ 118.

[39] *Id.* ¶ 120.

[40] *Id.* ¶ 121.

[41] *Id.* ¶ 122.

[42] *Id.* ¶ 122.

[43] *Id.* ¶ 123.

[44] *Id.* ¶ 124.

[45] *Id.* ¶ 125.

[46] *Id.* ¶ 126.

[47] *Id.* ¶ 137.

[48] *Id.* ¶ 138.

[49] *Id.* ¶ 139.

[50] *Id.* ¶ 141.

[51] Summary judgment is proper when there is no genuine dispute of material fact and the movant is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(a). A dispute as to a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). On a motion for summary judgment, the court must consider the "underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Slagle v. Cnty. of Clarion*, 435 F.3d 262, 264 (3d Cir. 2006) (citations omitted). If the movant carries its initial burden of showing the basis of its motion, the burden shifts to the non-moving party to go beyond the pleadings and point to "specific facts showing that a genuine issue exists for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). In other words, the non-moving party "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue." *Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (citation and internal quotation marks omitted). Summary judgment must be granted against a non-moving party who fails to sufficiently "establish the existence of an essential element of its case on which it bears the burden of proof at trial." *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 265 (3d Cir. 2014).

[52] *See generally* Bryon F. Egan, *Asset Acquisitions: Assuming and Avoiding Liabilities,* 116 PENN ST. L. REV. 913 (2012). Counsel for Shanks and Outlook Hong Kong confirmed Outlook Singapore's control under the stock sale doctrine during oral argument:

> Court: …at one point, these people took their direction from Outlook Hong Kong and at some day shortly thereafter they took their direction from Outlook Singapore, but they were working for the same branch company?
>
> Counsel: Because the branch company was purchased.

N.T. Oral Argument, Dec. 2, 2015, p. 83.

[53] *Lehman Bros. Holdings, Inc. v. Gateway Funding Diversified Mortg. Servs., L.P.*, 989 F.Supp. 2d 411, 431 (E.D.Pa. 2013) (citing *Fizzano Bros. Concrete Products, Inc. v. XLN, Inc.*, 42 A.3d 951, 968 (Pa. 2012)).

[54] *Phila. Elec. Co. v. Hercules, Inc.* 72 F. 2d. 303, 308 (3d. Cir., 1985).

[55] ECF Doc. No. 52, ¶¶ 67-68.

[56] *Berg Chilling Sys., Inc. v. Hull Corp.*, 435 F. 3d 455, 464-65 (3d. Cir. 2006) (citing *Luxliner P. L. Export Co. v. RDI/Luxliner, Inc.* 13 F.3d 69 (3d Cir. 1993)).

[57] *Ruiz v. Blentech Corp.*, 89 F.3d, 320, 325 (7th. Cir. 1996).

[58] *Berg Chilling Sys.*, 435 F. 3d at 465.

[59] *Id.* at 468.

[60] *Id.* (citing *Phila. Elec. Co.,* 762 F. 2d at 310).

[61] *Fizzano Bros.,* 42 A.3d at 969 (citing *Farris v. Glen Alden Corp.*, 142 A.2d 25, 28, 31 (Pa. 1958)).

[62] *Fizzano Bros.*, 42 A.2d at 970.

[63] *Berg Chilling Sys.*, 435 F. 3d at 469 (citing *United States v. General Battery Corp.,* 423 F. 3d 294, 306-07 (3d. Cir. 2005)).

[64] *Lehman Bros.*, 989 F.Supp.2d at 433.

[65] *Id.*

[66] *Id.* at 437.

[67] Sugartown did not allege a "fraudulent" conveyance ground to impose successor liability upon Outlook Singapore. In our December 8, 2015 Order, we found genuine issues of material fact precluding summary judgment on issues of fraud and intent given Defendants' alleged "long-standing plan to restructure Outlook Hong Kong and sell its subsidiaries to deal with the challenges of the Asian furniture market and to allow Outlook Singapore to do business with companies which were in Singapore and wanted to do business." Shanks SUMF at ¶ 69 (ECF Doc. No. 107-2).